UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RECEIVED BY MAIL

NOV 29 2023

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**MICHAEL LARSON,**

                   Plaintiff,

vs.

**TIMOTHY WALZ,** in his official capacity as Governor
of the State of Minnesota, **DEVINDER MALHOTRA,**
in his official capacity as Chancellor of the Minnesota
State Colleges and Universities, **MINNESOTA STATE
COLLEGE SOUTHEAST (MSCS), MARSHA
DANIELSON,** in her official capacity as President of
MSCS, **CHAD DULL,** in his official capacity as Vice
President of Academic Affairs at MSCS, **MEGAN
ZECHES,** in her official capacity as Chief Human
Resources Officer at MSCS,

                   Defendants.

COMPLAINT

DEMAND FOR A JURY TRIAL

Case Number: 23-cv-3664 ECT/TNL

In this wrongful-termination lawsuit, Plaintiff, MICHAEL LARSON, alleges the following:

## PARTIES

1. Plaintiff was a full-time English Instructor at Minnesota State College Southeast
   ("MSCS," sometimes "the college") from August 2003 until December 2021, when his
   employment was terminated by the college. He was based on the Winona campus of
   MSCS. He resides at N19449 Schmickle Valley Road, Trempealeau WI 54661.



SCANNED

NOV 29 2023

U.S. DISTRICT COURT MPLS

2. Defendant Timothy Walz has been the Governor of Minnesota continuously since January of 2019. His office address is 130 State Capitol, 75 Rev Dr. Martin Luther King Jr. Blvd., St. Paul MN 55155.

3. Defendant Devinder Malhotra was the Chancellor of the Minnesota State Colleges and Universities ("MinnState") from 2017 until August of 2023, when he retired. The MinnState system office address is 30 East 7th Street, St. Paul MN 55101-7804.

4. Defendant MSCS is one of the colleges in the MinnState system, with campuses at two locations: 1250 Homer Road, Winona MN 55987 and 308 Pioneer Road, Red Wing MN 55066.

5. Defendant Marsha Danielson has been the President of MSCS continuously since April of 2021. She has an office at the Winona campus of MSCS, which is located at 1250 Homer Road, Winona MN 55987.

6. Defendant Chad Dull was, at the time of events related to this suit, the Vice President of Academic Affairs at MSCS. Currently, on the website for the School District of La Crosse, he is listed as the Community Impact Coordinator, and the associated address is Hogan Administrative Building, 807 East Ave. South, La Crosse WI 54601.

7. Defendant Megan Zeches has been the Chief Human Resources Officer (CHRO) at MSCS continuously since March of 2021. She has an office at the Winona campus of MSCS, which is located at 1250 Homer Road, Winona MN 55987.

## JURISDICTION & VENUE

8. This court has diversity jurisdiction under 28 U.S. Code § 1332:

   a. During all the events giving rise to this action, as well as ever since, the Plaintiff has been a resident of Wisconsin.

b.  Defendant MSCS, the Plaintiff's former employer, is located in Minnesota, with physical campuses in the municipalities of Winona and Red Wing.

c.  During all the events giving rise to this action, all individual Defendants, when acting in their official capacities, were employed by Minnesota-based employers.

d.  This action is for damages in excess of $75,000.

9.  This court has federal-question jurisdiction under 28 U.S. Code § 1331. The Plaintiff alleges deprivation of constitutional rights with regard to the following:

a.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq., for employment discrimination on the basis of religion.

b.  U.S. Constitution Amendment Fourteen as pertaining to due process and equal rights protections.

10. This court has jurisdiction over other related claims under 28 U.S.C. § 1367.

11. Venue is proper to the District of Minnesota under 28 U.S.C. § 1391(b) in that the events giving rise to Plaintiff's claims occurred in this district.

12. Plaintiff received from the Equal Employment Opportunity Commission a private right-to-sue notification, dated August 31, 2023 and arriving at the Plaintiff's residence on or about September 2, 2023. (See Exhibit 1.)

13. This court has jurisdiction.


### GENERAL FACTUAL ALLEGATIONS

14. On August 11, 2021, Defendant Governor Walz issued HR/LR Policy #1446, "COVID-19 Proof of Vaccination and Testing." (See Exhibit 2.)

15. As of the policy's effective date, September 8, 2021, all state employees who needed to be at a worksite for more than 10 minutes would have to either provide "proof of full COVID-19 vaccination" or submit to "mandatory COVID-19 testing at least weekly."

16. The only type of weekly testing available through the college (i.e. at the college's expense) was the PCR nasal-swab test.

17. Specifically, for Winona-based MSCS employees, the weekly nasal-swab testing was contracted through Winona Health, an off-campus location.

18. The PCR nasal-swab test is an invasive diagnostic procedure insofar as it involves the insertion of a long swab into the nasal cavity of the subject, at a depth of up to four inches, ideally until it reaches the posterior wall of the nasopharynx, where it is swirled against the subject's nasal tissue in order to remove a sample of secretions.

19. Students at MSCS were not subject to HR/LR 1446. In other words, they were not required to present proof of COVID-19 vaccination, nor were they required to undergo weekly PCR testing.

20. The Plaintiff persistently refused the vaccine-or-test mandate, thus making him noncompliant with HR/LR Policy #1446.

21. According to the policy, employees who refuse both vaccination and testing "will be informed that they will be excluded from the workplace, and may be subject to disciplinary action, up to and including discharge, for refusing a work directive."

22. In a "Proposed Discharge" letter, dated November 23, 2021, Defendant Marsha Danielson, President of MSCS, reiterated to the Plaintiff that he was being disciplined, and could be fired, for not coming "into compliance with HR/LR # 1446."

23. In a "Notice of Sustained Discharge," dated December 2, 2021, Danielson announced to the Plaintiff that his discharge would be effective on December 3, 2021.

4

24. On December 3, 2021, MSCS terminated its employment relationship with the Plaintiff.

## CLAIMS FOR RELIEF

### Count One

**42 U.S.C. § 2000e, et. Seq. "Violation of Title VII of**
**the Civil Rights Act of 1964, as amended"**
**Religious Discrimination**
**(By Plaintiff Against Defendants MSCS, Marsha Danielson,**
**Chad Dull, and Megan Zeches)**

25. Plaintiff realleges and restates all previous allegations appearing above.

26. 42 U.S. Code § 2000e–2(a) states the following about employment practices:

> It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

27. 42 U.S. Code § 2000e defines "religion" as follows:

> (j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

28. On August 29, 2021, Plaintiff submitted to the college a document—as an attachment to

an email addressed to Defendants Megan Zeches (CHRO) and Chad Dull (Vice President

of Academic Affairs)—establishing his religious conviction against participation in the COVID-19 vaccines and PCR testing. (See Exhibit 3.)

29. By way of another attachment to that same email, the Plaintiff included a letter written by his priest, Fr. Andrew Dwyer, who expressed support for and endorsement of the Plaintiff's religious conviction. (See Exhibit 4.)

30. By way of another attachment to that same email, the Plaintiff included a document with extracts from Title VII of the Civil Rights Act of 1964 that outline an employer's obligation to accommodate a religious exemption request so long as it does not cause "undue hardship on the conduct of the employer's business." (See Exhibit 5.)

31. On August 30, Zeches sent an email to the Plaintiff stating that "There is no religion exemption for either of these policies. MSC Southeast expects you to comply with the requirements of the COVID-19 Proof of Vaccination and Testing policy and the mask mandate."

32. After hearing nothing more from the college about the matter of a religious exemption, the Plaintiff sent Zeches an email on September 8, 2021 (the effective date of Gov. Walz's mandate), asking the college to clarify whether or not it had officially denied his request.

33. On September 9, 2021, Zeches indicated in an email to the Plaintiff that the college would consider suggestions from him for accommodating his religious conviction.

34. For the fall semester of 2021, the Plaintiff was assigned to teach four courses that were completely online and one that was a hybrid: half online and half in the classroom. This 3-credit course, called College Writing II, had a scheduled class meeting time on the Winona campus of once per week, late Tuesday afternoons (from 2:30 to 3:55), for 85 minutes.

35. In Plaintiff's section of College Writing II, at the start of fall semester, there were 11 students enrolled in the course.

36. On September 17, 2021, the Plaintiff submitted, in an email to Defendants Zeches and Dull, three suggestions that he claimed would allow him to fulfill his essential duties without violating his religious objection to the mandate.

37. **The first solution** offered by the Plaintiff was that he could be granted a simple exemption from the mandate requirements. (Plaintiff alleges facts related to this solution in the following paragraphs.)

38. First, the Plaintiff only needed to be on campus for approximately an hour-and-a-half per week. All of his other duties for that course, and for all his other courses, could have been performed online.

39. Second, if the Plaintiff had been granted a religious exemption from the mandate, he would have been, when teaching his hybrid course on campus, in the same relationship to HR/LR 1446 as his students, who were also unobligated by the mandate.

40. Third, in general, students on campus at MSCS greatly outnumber faculty and staff on campus, and in the Plaintiff's hybrid course that semester (his only on-campus obligation), potentially unvaccinated and untested students outnumbered faculty, 11 to one.

41. Fourth, the classroom in which the hybrid course met was large and well-ventilated; there was no need for close physical interaction between the Plaintiff and the students.

42. Fifth, this solution (of granting a simple exemption) would not have added any financial burden to the college, nor any time-consuming administrative action, nor any burden to any other staff.

43. **The second solution** offered by the Plaintiff in the September 17 email was that the college could move the hybrid course to full online status. (Plaintiff alleges facts related to this solution in the following paragraphs.)

44. First, the Plaintiff had successfully taught College Writing II in a fully online format many times before.

45. Second, during the prior three semesters, for purported reasons of campus safety, MinnState (and MSCS) had exhorted instructors to move online whatever courses could be so taught.

46. Third, a justification for HR/LR 1446, stated in the policy itself, was "to protect, to the extent reasonably possible, the health and safety of our employees and our customers from the direct threat resulting from the spread of COVID-19 in the workplace." Thus, a fully online version of the course—especially considering the potentially unvaccinated and untested students—would better accomplish the objective of the policy than would a hybrid course.

47. Fourth, during that semester at MSCS, another instructor was teaching the only other section of College Writing II, which was completely online and which had filled to its capacity of 25 students before the start of the semester. Thus, any students in the Plaintiff's section who may have preferred to take the fully online course would not have been able to get in.

48. Fifth, the hybrid course was already half online; thus, switching to full online would not be a complete or radical shift in delivery.

49. Sixth, this solution (of changing the course in question from half online to fully online) would not have added any financial burden to the college, nor any time-consuming administrative action, nor any burden to any other staff.

50. **The third solution** offered by the Plaintiff in the September 17 email was that the college could assign or hire another instructor for the hybrid course and then overload the Plaintiff in the following semester to compensate for his lighter load in the fall semester. (Plaintiff alleges facts related to this solution in the following paragraphs.)

51. First, the Plaintiff was contractually obligated to teach 30 credits in the academic year (i.e. combined fall and spring semesters) and not any particular number per semester. If the college had removed him from the hybrid course, his credit load in fall semester would have been 13. In the September 17 email, the Plaintiff suggested to the college that it could assign him 17 credits in spring semester, thus bringing him to his contractually obligated 30 credits for the academic year.

52. Second, at MSCS, it is not uncommon for instructors to teach an unequal number of credits between fall and spring semesters; the Plaintiff had done so several times in his 18 years with the college.

53. Third, at this time in his career, the Plaintiff was at the top of the faculty pay scale; thus, if the college had assigned him 17 credits in the spring semester, any adjunct-hire to replace him in the fall hybrid section of College Writing II would have cost the college less than if it had retained the Plaintiff to teach that same course.

54. On September 20, 2021, Zeches indicated in an email to the Plaintiff that the college had rejected all three of his accommodative solutions, each of which was characterized by Zeches as being unreasonable.

55. The college made no suggestions of its own to accommodate the Plaintiff's religious objection to the vaccine-or-test mandate, as depicted in HR/LR 1446.

56. The college failed to demonstrate "undue hardship on the conduct of [its] business" that would have resulted from accommodations suggested by the Plaintiff.

9

57. On September 22, the college suspended the Plaintiff from performing any of his

    teaching duties (even for his online courses) and ceased paying his salary.

58. The Plaintiff was kept in suspension without pay for the remainder of his relationship

    with the college, which terminated his employment on December 3, 2021.

59. Because the college refused to accommodate the Plaintiff's sincerely held religious

    conviction with regard to HR/LR 1446, Plaintiff suffered damages in the form of lost

    income, lost employment, sullied reputation, and emotional duress.

<br>

## Count Two

## 42 U.S.C. § 1983 "Violation of Due Process under the Fourteenth Amendment"
## Deprivation of Substantive Due Process
## (By Plaintiff Against All Defendants)

<br>

60. Plaintiff realleges and restates all previous allegations appearing above.

> No state shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any State deprive any person
> of life, liberty, or property, without due process of law.

    U.S. Const., 14th Amend., § 1.

61. "Due process rights" are defined as follows:

> All rights which are of such fundamental importance as to require compliance
> with due process standards of fairness and justice. Procedural and substantive
> rights of citizens against government actions that threaten the denial of life,
> liberty, or property. *Black's Law Dictionary* 501 (6th ed. 1990).

62. A substantive component of the Due Process Clause prohibits arbitrary, wrongful,

    government actions "regardless of the fairness of the procedures used to implement

    them." *Zinerman v. Burch*, 494 U.S. 113, 125 (1990).

63. Regarding bodily autonomy:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Union Pacific R. Co.* v. *Botsford,* 141 U. S. 250, 251 (1891).

64. "Every human being of adult years and sound mind has a right to determine what shall be done with his own body." *Schloendorff* v. *Society of New York Hospital,* 211 N. Y. 125, 129-130, 105 N. E. 92, 93 (1914).

65. "The informed consent doctrine has become firmly entrenched in American tort law … The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment." *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 269, 270 (1990).

66. All COVID-19 vaccines available at the time of events giving rise to this action were classified by the U.S. Food & Drug Administration (FDA) as Emergency Use Authorization (EUA) products.

67. All COVID-19 diagnostic tests available at the time of events giving rise to this action, including PCR tests, were classified by the FDA as EUA devices.

68. Regarding the administration of EUA products, federal law, as codified in Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III) of the Federal Food, Drug, and Cosmetic Act, requires that

> individuals to whom the [EUA] product is administered are informed—
>
> (I) that the Secretary has authorized the emergency use of the product;
> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
> (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

69. In a federal court ruling that prohibited the U.S. military from mandating EUA vaccines for soldiers, the court held that "… the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs." *Doe #1 v. Rumsfeld*, 297 F.Supp.2d 119, 135 (2003).

70. Minnesota state law also explicitly protects the individual's right to refuse unwanted medical interventions. MN Stat. 12.39 § subd. 1, states:

> Notwithstanding laws, rules, or orders made or promulgated in response to a national security emergency or peacetime emergency, individuals have a fundamental right to refuse medical treatment, testing, physical or mental examination, vaccination, participation in experimental procedures and protocols, collection of specimens, and preventive treatment programs.

71. Governor Walz's EUA mandate (HR/LR Policy #1446) countered federal- and state-protected rights of refusal with coercive threats. As the policy itself warns, state employees who refuse both vaccination and testing "will be informed that they will be excluded from the workplace, and may be subject to disciplinary action, up to and including discharge, for refusing a work directive."

72. The use of coercion in response to an individual's right of refusal is in essence a negation of that right of refusal. In other words, an individual can no longer exercise the right without suffering the damages named in the coercive threat.

73. The coercive response to a right of refusal directly attacks the liberty interest of the individual, which is protected by the Fourteenth Amendment, codified in various federal and state statutory laws, and reiterated repeatedly at common law.

74. Another type of deprivation of Substantive Due Process has to do with the arbitrariness of government actions inflicted upon the individual.

12

75. *Black's Law* defines "arbitrary" as something "not governed by any fixed rules or standard. Willful and unreasoning action, without consideration and regard for facts and circumstances presented" 104 (6th ed. 1990).

76. Some scientific studies have revealed the inefficacy of the COVID vaccines in providing much, if any, protection against the transmission of the SARS-CoV-2 virus.

77. Some of these studies were known before the start of MSCS's 2021 fall semester, and many more became known throughout that semester, as well as during the time since then.[1]

78. Even then-Director of the Centers for Disease Control and Prevention (CDC) Rochelle Walensky acknowledged, in early August of 2021, that "what they [the vaccines] can't do anymore is prevent transmission."[2]

79. As a diagnostic tool, the PCR nasal-swab test increases in the percentage of false positives with the number of cycles run (the "Ct" value) on a given test. As the *Cormen-Drosten Review Report* clarifies,

> The maximum reasonably reliable Ct value is 30 cycles … PCR data evaluated as positive after a Ct value of 35 cycles are completely unreliable. Citing Jaafar et al. 2020 [3]: "At Ct = 35, the value we used to report a positive result for PCR, <3% of cultures are positive." In other words, there was no successful virus isolation of SARS-CoV-2 at those high Ct values. Further, scientific studies show that only non-infectious (dead) viruses are detected with Ct values of 35.[3]

---

[1] See, for instance, "Extensive Efficacy Studies that Rebuke Vaccine Mandates," by Paul Elias Alexander, *Brownstone Institute*, Oct. 28, 2021. https://brownstone.org/articles/16-studies-on-vaccine-efficacy/, where over 70 such studies are cited and summarized, or "Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States," *European Journal of Epidemiology*. Correspondence, Sep. 30, 2021. https://doi.org/10.1007/s10654-021-00808-7.

[2] See the article by Madeline Holcombe and Christina Maxouris, "Fully vaccinated people who get a Covid-19 breakthrough infection can transmit the virus, CDC chief says," CNN. Aug. 6, 2021. https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

[3] See Pieter Borger, et al., "External peer review of the RTPCR test to detect SARS-CoV-2 reveals 10 major scientific flaws at the molecular and methodological level: consequences for false positive results," *Cormen-Drosten Review Report*, Nov. 27, 2020, https://resetheus.org/wp-content/uploads/2022/12/corman-drosten-review-report.pdf.

80. Dr. Anthony Fauci, former Director of the National Institute of Allergy and Infectious

Diseases and Chief Medical Advisor to the President of the United States, corroborated

this information when he appeared for an interview on *This Week in Virology*, airing July

16, 2020. Fauci said in the interview,

> If you get a cycle threshold of 35 or more, that the chances of it being replication-competent are minuscule … You almost never can culture virus from a 37-threshold cycle. So, I think if somebody does come in with 37, 38, even 36, you got to say, you know, it's just, it's just dead nucleotides, period.[4]

81. Yet the FDA recommended that testing labs use a Ct value of 40 in determining PCR test

results.[5]

82. Among the 20-some PCR test-kit manufacturers reviewed in a study by the FIND

organization, the recommended Ct value ranged from 37 to 42.[6]

83. And in a discussion of the *New York Times* article, "Your Coronavirus Test Is Positive.

Maybe It Shouldn't Be," Marie Landry, M.D., Director of the Clinical Virology

Laboratory at Yale New Haven Hospital, indicates that laboratory cutoffs for the PCR

test range from 37 to 45.[7]

84. At the Ct values recommended by the FDA and testing-kit manufacturers—and used by

testing laboratories—the reliability rate of positive PCR test results is less than 3%,

---

[4] See "Covid-19 with Dr. Anthony Fauci," interview, *This Week in Virology*, 16 July 2020,
https://www.youtube.com/watch?v=a_Vy6fgaBPE&t=230s.

[5] See "CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel." Revision 07. July 21,
2021, 34-35. https://www.fda.gov/media/134922/download.

[6] See "SARS-COV-2 MOLECULAR ASSAY EVALUATION: RESULTS," FIND, 3 July 2020: 2-5.
https://www.gettyhr.com/-/media/Mercer/Getty/Documents/FIND-SARS-COV2-Molecular-Assay-Evaluation-
Results.pdf?rev=e4e6c7f043be455fb0f076cfac18d69b.

[7] See "Your Coronavirus Test is Positive. Maybe It Shouldn't Be." Published in *New York Times*, August 29, 2020.
https://pdf4pro.com/view/your-coronavirus-test-is-positive-maybe-it-shouldn-t-be-609732.html.

according to the study by Jaafar et al, "minuscule" according to Dr. Fauci, and nonexistent according to others.[8]

85. It was an arbitrary act on its face for the Defendants to insist, on pain of employment dismissal, that all state employees take either 1) a vaccine that does not prevent transmission of the SARS-CoV-2 virus, or 2) an indefinite number of weekly diagnostic tests that are unable to make reliable positive identifications for the presence of the SARS-CoV-2 virus.

86. The arbitrariness of this act is amplified when the individual circumstances of the Plaintiff are taken into consideration: 90% of his courseload was already completely online; he had expressed a religious-based conviction against the mandate; and he had proposed accommodations.

87. Governor Walz initiated the policy (HR/LR #1446), including its coercive elements; Defendant Devinder Malhotra, while Chancellor of MinnState, promulgated the policy to all of the schools in the MinnState system; and Defendant MSCS, through its leadership team at that time—including Defendants Danielson, Dull, and Zeches—implemented and enforced the policy.

88. As a result of these wrongful and arbitrary acts by the Defendants, Plaintiff's liberty interest, under the Fourteenth Amendment, was ignored, and he was eventually discharged for exercising his federal- and state-protected right to refuse unwanted medical interventions.

---

[8] See, for example, the study by Bernard La Scola et al., "Viral RNA load as determined by cell culture as a management tool for discharge of SARS-CoV-2 patients from infectious disease wards," *European Journal of Clinical Microbiology & Infectious Diseases*, 39, 1059-1061(2020).

## Count Three

### 42 U.S.C. § 1983 "Violation of Due Process under the Fourteenth Amendment"
### Deprivation of Procedural Due Process
### (By Plaintiff Against Defendants MSCS, Danielson, Dull, and Zeches)

89. Plaintiff realleges and restates all previous allegations appearing above.

90. At the time of events giving rise to this action, MSCS had no process in place to consider claims of religious conviction against the vaccinate-or-test mandate (HR/LR #1446).

91. Defendant Zeches first claimed that there was no religious exemption for PCR testing.

92. During the week leading up to the implementation of HR/LR 1446, the college did not communicate to the Plaintiff whether or not it had formally rejected his religious exemption request.

93. When the Plaintiff asked for clarification on Sep. 8 (the day of implementation), the college responded that it was waiting for the Plaintiff to propose accommodations for his religious objection. Prior to this, the college had not informed the Plaintiff of any procedural steps to be followed.

94. When the college rejected Plaintiff's accommodation proposals, it did not offer him any process for appealing that decision.

95. The Plaintiff was deprived of any clear explanation of how his religious exemption request would be processed, what decision-making criteria would be used, or when he could expect those decisions to occur.

## Count Four
### 42 U.S.C. § 1983 Violation of the Equal Protection Clause

**under the Fourteenth Amendment**
**(By Plaintiff Against All Defendants)**

96. Plaintiff realleges and restates all previous allegations appearing above.

97. By imposing HR/LR 1446 across the board on all state employees, Defendants Walz and
Malhotra created some physical environments on state property—e.g. at non-residential
colleges in the MinnState system—where one class of citizens was treated differently
than another class with regard to their vaccination or testing status. Students of the school
were allowed on campus without proof of either vaccination or testing, whereas
employees of the school were not.

98. And it was the minority group—the employees—who were burdened by the requirements
of the policy.

99. Students and employees at MSCS shared most of the same indoor physical spaces.

100.    In the case of the Plaintiff, noncompliance with the policy cost him his job, but
students who did not comply with the policy were neither expelled from MSCS nor even
barred from campus.


**Count Five**
**Wrongful Termination**
**"Public Policy" Exception to Employment-at-Will Doctrine**
**(By Plaintiff Against All Defendants)**

101.    Plaintiff realleges and restates all previous allegations appearing above.

102.    Against a strict application of the employment-at-will doctrine, the Minnesota
Court of Appeals summarizes three judicially created exceptions, one of which is
described as follows:

> a "public policy" exception, based in tort, which permits recovery upon the finding that the employer's conduct undermines some important public policy ... Simply stated, the exception provides that an employer becomes subject to tort liability if its discharge of an employee contravenes some well-established public policy ... The exception began as a narrow rule permitting employees to sue their employers when a statute expressly prohibited their discharge. The rule later expanded to include **any discharge in violation of a statutory expression of public policy.** *Phipps v. Clark Oil & Refining Corp.*, 396 NW 2d 588, 590, 591 (Minn.App. 1986).

103.    MN Stat. 12.39 § subd. 1 is a well-established statutory expression of public

policy and states:

> Notwithstanding laws, rules, or orders made or promulgated in response to a national security emergency or peacetime emergency, **individuals have a fundamental right to refuse medical treatment, testing, physical or mental examination, vaccination,** participation in experimental procedures and protocols, collection of specimens, and preventive treatment programs.

104.    As the statute points out, a *fundamental* right exists even when there is a state of

emergency, let alone when there isn't.

105.    MN Stat. 12.39 was violated by the Defendants, via HR/LR 1446, when the

Plaintiff was discharged from MSCS as a direct result of his choosing to exercise his

"fundamental right to refuse medical" testing and vaccination.

106.    This violation triggers the "public policy" exception to the employment-at-will

doctrine and creates a cause of action for the wrongful termination of the Plaintiff.

**Count Six**

**Breach of Contract**

**(By Plaintiff Against Defendants MSCS, Danielson, Dull, and Zeches)**

107.    Plaintiff realleges and restates all previous allegations appearing above.

108.     The Plaintiff was a member of the Minnesota State College Faculty (MSCF)
union.

109.     There existed between MSCS and the Plaintiff a faculty contract negotiated by the
MSCF.

110.     Article 25 of that contract delineates a specific procedure for the college to follow
when pursuing disciplinary actions with faculty members. The sequence is as follows: 1)
Written reprimand, 2) Suspension (with or without pay), and 3) Dismissal. (See Exhibit
6.)

111.     On September 22, 2021, the college suspended the Plaintiff from performing any
of his employment duties and placed him in "no-pay" status.

112.     It was not until October 14, 2021, that Defendant Chad Dull sent the Plaintiff a
Letter of Reprimand.

113.     Thus, the college reversed the contractual sequence of starting the disciplinary
procedure with a written reprimand before moving on to suspension without pay.

114.     Article 25 of the contract also specifies that "a faculty member may be suspended
for up to fifteen (15) work days with or without pay for just cause."

115.     Since the college suspended the Plaintiff from work duties on September 22 and
stopped paying him thereafter, the 15-day contractual limit for such suspension was
reached on October 13, 2021.

116.     Article 27 of the faculty contract allows for a faculty member to file a grievance
with the union. It states that "No grievance shall be entertained or processed unless it is
submitted within twenty-five (25) working days after the occurrence of the event giving
rise to the grievance" and that "Grievances that are not submitted within the time lines
shall be deemed to be withdrawn." (See Exhibit 7.)

117.     Sometime between September 23 and October 13, the Plaintiff attempted to file a
grievance with the MSCF union, pointing out that the disciplinary sequence had been
breached and that the college had given the Plaintiff no indication of any intended limit
on the number of days it would keep him in suspension without pay. (See Exhibit 8.)

118.     When the Plaintiff sent this grievance, by way of an email attachment, to his
union representative at MSCS, he was told by two different representatives that the union
would not process it.

119.     Prior to the implementation of HR/LR 1446, the MSCS faculty had been warned,
off-record, that the MSCF would not support MinnState faculty who resisted the
mandate.

120.     Because the union refused to grieve the Plaintiff's complaints regarding
disciplinary breaches, the Plaintiff was left without defense against the effects—financial,
professional, emotional, etc.—of those breaches and remained in the no-man's land of
suspension without pay until he was terminated on December 3, 2021.

121.     Whether or not the union's stand-down silence was an emboldening factor in the
college's actions, there was nevertheless a breach of contract, and the Plaintiff had no
remedy at law for said breach until this present cause of action.

## REQUEST FOR RELIEF

122.     WHEREFORE, Plaintiff respectfully requests that the Court grant the following
relief:

A.     To declare the mandating of EUA medical interventions unconstitutional.

B.      To declare that HR/LR Policy #1446 was in violation of federal and state statutory law, reiterated at common law, which protects the individual right to refuse medical treatment.

C.      To declare that Defendant MSCS was remiss in its failure to accept reasonable accommodation for Plaintiff's religious objection to HR/LR Policy #1446.

D.      To award Plaintive not less than $250,000 in damages for lost income and benefits, for the effective shortening of his chosen career, for the harm done to his professional reputation, and for the emotional duress endured.

E.      To award Plaintiff reimbursement for any reasonable costs or expenses associated with his conduct of this lawsuit.

F.      To grant any further relief that the Court determines to be just and proper.

Dated: 27 November 2023                       Respectfully submitted,

                                              Michael Larson, Pro-se Plaintiff

                                              N19449 Schmickle Valley Road
                                              Trempealeau WI 54661
                                              michaelpaullarson@protonmail.com
                                              (608) 539-2162

21